845 P.2d 784

Marilyn BELLET, Ruth Levanthal, and Audrey Merves, Plaintiffs–Appellees,

v.

Jack GRYNBERG, d/b/a Jack Grynberg and Associates, Defendant–Appellant,

v.

Nancy Roberts SCHROEDER, Executrix of the Estate of Victor Roberts, deceased, Additional Party Defendant–Appellee.

No. 20374.

Supreme Court of New Mexico.

Nov. 16, 1992.

James E. Kirk, Albuquerque, for defendant-appellant.

W.T. Martin, Jr., Carlsbad, for plaintiffs-appellees.

## OPINION

FROST, Justice.

On August 15, 1991, the trial court ordered the Appellee working interest owners, Marilyn Bellet, Ruth Levanthal, Audrey Merves, and the estate of Victor Roberts, to pay the oil well operator Jack Grynberg, Appellant, their proportionate shares of the oil well operation costs from November 1982 through December 1985. The trial court denied Grynberg's request for prejudgment interest, however, and further concluded that the Appellees were not responsible for operation costs after January 1986. Grynberg appeals and challenges these findings and conclusions by the trial court. We reverse the trial court's decision on the issue of prejudgment interest and remand to the trial court so that it may include the interest at the statutory rate. We affirm the trial court's decision denying operation costs as personal obligations of the Appellees after January 1986.

## I.

By 1974, Grynberg was operating the six Eagle Creek oil wells GR–1 through GR–6 in Eddy County, New Mexico that are at the center of this dispute. From 1974 through November 1982, Navajo Crude Oil Purchasing Company (Navajo) purchased all of the oil from the six wells and made regular payments directly to the working interest owners. In 1977, Grynberg filed a claim against the Appellees alleging they had not paid their share of the operating costs from 1975 through 1982. In 1983, in a prior case numbered CV–77–377, the trial court ordered the Appellees to pay their shares of the operating costs and "continue to pay such operating costs and the operator's fee that has been charged by the

Plaintiff in the past for operation in the future until such time as the parties enter into an operating agreement covering the said wells."

Contrary to the expectations of the trial court, the parties never signed an operating agreement, and contrary to the order of the trial court, the Appellees did not pay their share of the operating costs accrued after November 1982. In September 1985, the Appellees brought suit to obtain from Grynberg an accounting of operating costs on the six oil wells that they alleged were operating at a loss. Grynberg counterclaimed to recover the operating expenses unpaid since November 1982. Grynberg now attacks specific findings and conclusions made by the trial court on August 15, 1991.

## II.

First, Grynberg attacks the findings and conclusions on the prejudgment interest issue. The trial court found that Grynberg "intended to collect interest at the rate of 15% *compounded monthly,* which is in excess of the statutory rate of 15% simple interest allowed in cases where interest is not specified by written contract." The trial court concluded that the judgment "shall not bear pre-judgment interest by reason of Defendant Grynberg's attempt to impose and collect interest in excess of the rate allowed by law."

The trial court's finding, without so saying, is based on the affirmative defense of usury. *See generally Maulsby v. Magnuson,* 107 N.M. 223, 224, 755 P.2d 67, 68 (1988) (defendants properly raised the affirmative defense of usury). The Appellees did not include the defense of usury in their pleadings. Apparently, the trial court considered the issue of usury to have been tried with Grynberg's implied consent and deemed the pleadings amended in accordance with SCRA 1986, 1–015(B) (Repl.Pamp.1992) to reflect that perception. Grynberg contends that this amendment was an abuse of discretion. We agree.

■ "Amendments are within the trial court's discretion and will be reversed on appeal only for abuse of discretion."

*Schmitz v. Smentowski,* 109 N.M. 386, 390, 785 P.2d 726, 730 (1990). Finding an abuse of discretion is appropriate when the opposing party has been prejudiced by the amendment. *Laurie R. v. New Mexico Human Servs. Dep't,* 107 N.M. 529, 533, 760 P.2d 1295, 1299 (Ct.App.1988). Prejudice occurred if the party did not have a fair opportunity to defend the theory or could have offered additional evidence on the new theory. *Schmitz,* 109 N.M. at 391, 785 P.2d at 731.

"The theory of pleadings is to give the parties fair notice of the claims and defenses against them, and the grounds upon which they are based." *Id.* at 389, 785 P.2d at 729. Even if a theory was not pleaded, if it was tried by implied consent it indicates that the party was aware of the unpleaded theory being alleged and had the opportunity to defend against it, thereby preventing a finding of prejudice. However, implied consent to a theory is not indicated when unobjected-to-evidence is relevant to other pleaded theories. *Id.* at 390, 785 P.2d at 730.

■ While Grynberg did testify that he intended to charge 15% interest compounded monthly, this miscalculation did not *per se* indicate usury. The seminal case on the issue in New Mexico mandates that a specific intent to violate the usury law must be shown to prevail on that defense. *Maulsby,* 107 N.M. at 225, 755 P.2d at 69. The word "usury" did not come up during the trial and the testimony cited by the Appellees as dealing with usury was, when considered in context, addressed to the issue of determining the proper amount of prejudgment interest. For this reason, usury was not tried with Grynberg's implied consent.

Furthermore, we believe Grynberg could have defended the usury theory had he known it to be an issue. For example, he could have introduced evidence indicating his lack of intent to violate the usury law. By the time the Appellees raised the defense of usury in their requested findings of fact and conclusions of law, Grynberg to his prejudice was precluded from introducing this additional evidence.

The Appellees note that even had Grynberg objected, the issue of usury could have been argued, "if 'the presentation of the merits of the action would have been subserved thereby.' " *George M. Morris Constr. Co. v. Four Seasons Motor Inn, Inc.*, 90 N.M. 654, 658, 567 P.2d 965, 969 (1977) (quoting an earlier version of Rule 1–015(B)). This is true only if no prejudice would result from the amendment. If prejudice would result, then allowing the unpleaded theory to be argued, and granting an amendment, would be an abuse of discretion. Here, Grynberg did not even have the opportunity to object because he was unaware that the defense of usury was at issue.

Because the affirmative defense of usury was not properly pleaded and because the resulting prejudice should have prevented the trial court from deeming those pleadings amended, the issue of usury was waived. "[I]t is well settled that an affirmative defense not pleaded or otherwise properly raised is waived" and may not be considered on appeal. *Xorbox v. Naturita Supply Co.*, 101 N.M. 337, 339, 681 P.2d 1114, 1116 (1984).

■ Thus, we must resolve the issue of prejudgment interest without considering the defense of usury. In *Ranch World of New Mexico, Inc. v. Berry Land & Cattle Co.*, 110 N.M. 402, 796 P.2d 1098 (1990), we stated:

> This Court has adopted the view of the *Restatement of Contracts* § 337(a) (1932) that prejudgment interest should be awarded as a matter of right where the defendant has breached a contract to pay a definite sum of money. Nevertheless, we also recognize that the award should not be made "arbitrarily without regard for the equities of each particular situation."
>
> ... [I]t is the defendant's burden to adduce a sufficient basis for the denial of such an award where the amount due is known with reasonable certainly [sic] at the time of defendant's breach. Certainly one of the foremost equitable considerations before a trial court is the fact that a plaintiff has been denied the use of the money during the pendency of the law-

suit. In the case of a liquidated debt, prejudgment interest generally should be awarded absent peculiar circumstances. The award does not represent a penalty, but is in the nature of compensation for the loss of the use of the funds.

*Id.* at 404, 796 P.2d at 1100 (citations omitted). Without the benefit of the defense of usury, we cannot see any reason why the Appellees should not be required to' fully compensate Grynberg for the loss of the use of the delinquent oil well operation costs. Accordingly, we remand to the trial court so that it may calculate the proper amount of prejudgment interest at the statutory rate.

### III.

Grynberg also claims that the trial court erred in denying him a personal judgment against Appellees for operation costs after January 1986. He contends that the 1983 order requiring the Appellees to pay future operation costs until the parties entered into an operating agreement (and the parties never did) should have barred relitigation of the operation costs issue. We find that while the trial court did acknowledge the validity of the 1983 order, it concluded that changed circumstances in 1986 (the operation of the wells at a loss for speculative recovery purposes) prevented the order's application after that time. We agree.

■ *Res judicata* bars a subsequent suit when a judgment was adjudicated on the merits in a previous lawsuit involving the same cause of action and the same parties. *State v. Cotton Belt Ins. Co.*, 97 N.M. 152, 153–54, 637 P.2d 834, 835–36 (1981). However, changed circumstances may prevent *res judicata* from operating, as we explained in *Cotton Belt:*

> "The doctrine of res judicata was never intended to operate so as to prevent a reexamination of the same question between the same parties where, in the interval between the first and second actions, the facts have materially changed or new facts have occurred which may have altered the legal rights or relations of the litigants."

*Id.* at 154, 637 P.2d at 836 (quoting *Hurd v. Albert*, 214 Cal. 15, 3 P.2d 545, 549 (1931)).

In the 1983 order, the trial court presupposed that the profit from the wells would exceed the operating costs. In the present action, the trial court found that production had become marginal in late 1985, and beginning in September 1986 to the date of the final hearing on April 30, 1991, the wells were operated at a cumulative net loss of more than $150,000. The trial court further found that Grynberg's objective in continuing to operate the wells at a loss was to preserve the wells for a secondary recovery program using water flooding or carbon dioxide injection. The court found that this operation was for a speculative purpose. Grynberg does not attack any of these fact findings, so they are binding for the purposes of this appeal. *Cordova v. Broadbent,* 107 N.M. 215, 216, 755 P.2d 59, 60 (1988). These new facts did alter the legal rights of the litigants, thereby preventing the application of *res judicata.*

Thus, the trial court properly reconsidered the operation costs issue. However, the trial court grappled with an issue of first impression in this state. New Mexico statutory and case law is silent as to the legal rights and obligations of working interest owners of a leasehold absent an operating agreement. Following Texas law, the trial court addressed the working interest owners' relationship based upon their status as cotenants. We adopt Texas law on this issue.

In *Neeley v. Intercity Management Corp.,* 732 S.W.2d 644 (Tex.Ct.App. 1987), the court set out the general rules governing the relationship between cotenants. The term "nonconsenting" means that the nonoperating cotenant has not given his express or implied consent to share in the expenses of exploration, drilling, development, or operation of an oil well in an operating agreement or otherwise. *See id.* at 646. The court held that in the absence of an operating agreement addressing this eventuality, an operating cotenant has the right to proportionate reimbursement from a nonconsenting cotenant by way of personal judgment or equitable lien when he spends money that is reasonable and necessary to preserve the common estate. *Id.*

The law, in effect, implies a contract on the part of the nonconsenting cotenant to pay his proportionate share of the reasonable and necessary expenses. *Id.*

However, the operating cotenant may only recover *"out of the share in actual production"* for money spent speculatively. *Id.* (construing *Shaw & Estes v. Texas Consol. Oils,* 299 S.W.2d 307, 313 (Tex.Civ.App.1957)). In *Neeley,* the appellants contested the special issue submitted to the jury at trial that allowed the appellees to recover operating expenses billed on an oil field that "wasn't producing enough to pay for itself." *Neeley,* 732 S.W.2d at 647. The appellate court reversed the trial court, holding that the "[a]ppellees were not entitled to recover for speculative efforts to preserve the common estate, if unsuccessful." *Id.* A distinction must be made between expenditures which are necessary and reasonable to preserve the estate from those which are speculative and not necessary to protect the cotenants' rights. If the expenditures are necessary and reasonable, the operating cotenant may obtain a personal judgment against the other owners for their pro-rata share of all expenses. However, for expenditures speculatively made, the operating cotenant may seek reimbursement only from production.

The trial court properly applied the above described principles to our set of facts. First, the Appellees were nonconsenting working interest owners because they had no operating agreement and made no other express or implied promise to pay operation expenses. Second, the trial court refused to imply a contract between the Appellees and Grynberg after 1986 because it properly found that the operating expenses beginning in 1986 were not reasonable and necessary to preserve the estate. As there was no contract, implied by law or otherwise, the trial court properly determined the Grynberg was not entitled to recover, except out of proceeds, the operation expenses speculatively applied towards the secondary recovery of oil.

Most other states have not yet had the opportunity to deal with this particular oil production problem. Our resolution of this issue attempts to protect the operating cotenants, the nonoperating nonconsenting

cotenants, and the public's need for oil. The law of oil and gas is designed to further oil and gas exploration and development. Our goal should be to promote oil development and at the same time properly allocate the monetary risks of keeping oil wells in production.

We believe our holding achieves this objective. The operating cotenant will feel comfortable expending money for "necessary and reasonable" maintenance on the wells, knowing the nonconsenting cotenants are legally responsible for paying their share of these costs. In addition, the nonoperating nonconsenting cotenants will be protected from bearing the personal risk of speculative efforts to preserve the production of the well.

For the reasons expressed herein, we reverse and remand in part and affirm in part.

IT IS SO ORDERED.

RANSOM, C.J., and FRANCHINI, J., concur.